IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STACY ANN KUSKO | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| KILOLO KIJAKAZI, Acting | : | NO.  22-95 |
| Commissioner of Social Security | : | |

**MEMORANDUM AND ORDER**

ELIZABETH T. HEY, U.S.M.J.                                          August  18    , 2023

Stacy Ann Kusko ("Plaintiff") seeks review of the Commissioner's decision

denying her application for disability insurance benefits ("DIB").  For the reasons that

follow, I conclude that the decision of the Administrative Law Judge ("ALJ") is not

supported by substantial evidence and remand for further proceedings pursuant to

sentence four of 42 U.S.C. § 405(g).

## I.     **PROCEDURAL HISTORY**

Plaintiff protectively filed for DIB on September 12, 2019, alleging that her

disability began on August 15, 2014, as a result of wrist and elbow injuries and multiple

surgeries, limited mobility of the right wrist and elbow, chronic back issues, plantar

fasciitis, anxiety, and depression.  Tr. at 70, 152, 176.[1]  Plaintiff later amended her

---

[1]To be entitled to DIB, Plaintiff must establish that she became disabled on or
before her date last insured ("DLI").  20 C.F.R. § 404.131(b).  The Certified Earnings
Record indicates and the ALJ found that Plaintiff was insured through December 31,
2019.  Tr. at 15, 162.

alleged onset date to September 19, 2019.  Id. at 258.[2]  Plaintiff's application was denied

initially, id. at 84-87, and on reconsideration, id. at 89-91, and Plaintiff requested a

hearing before an ALJ.  Id. at 92-93.  After holding a hearing on April 22, 2021, id. at 35-

62, the ALJ found on May 25, 2021, that Plaintiff was not disabled.  Id. at 15-29.  The

Appeals Council denied Plaintiff's request for review on December 2, 2021, id. at 1-3,

making the ALJ's May 25, 2021 decision the final decision of the Commissioner.  20

C.F.R. § 404.981.

Plaintiff commenced this action in federal court on January 10, 2022, Doc. 1, and

the matter is now fully briefed and ripe for review.  Docs. 6-8.[3]

## II.   **LEGAL STANDARDS**

To prove disability, a claimant must demonstrate an "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment . . . which has lasted or can be expected to last for . . . not less than twelve

months."  42 U.S.C. § 423(d)(1).  The Commissioner employs a five-step process,

evaluating:

> 1.      Whether the claimant is currently engaged in
> substantial gainful activity;
>
> 2.      If not, whether the claimant has a "severe
> impairment" that significantly limits her physical or mental
> ability to perform basic work activities;

---

[2]The ALJ did not acknowledge the change in alleged onset date.  See tr. at 15
(ALJ's opinion noting alleged onset date of August 15, 2014).

[3]The parties consented to magistrate judge jurisdiction pursuant to 28 U.S.C.
§ 636(c).  See Standing Order, In RE:  Direct Assignment of Social Security Appeals to
Magistrate Judges – Extension of Pilot Program (E.D. Pa. Nov. 27, 2020); Doc. 4.

> 3.      If so, whether based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the listing of impairments ("Listings"), 20 C.F.R. pt. 404, subpt. P, app. 1, which results in a presumption of disability;
>
> 4.      If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe impairment, the claimant has the residual functional capacity ("RFC") to perform her past work; and
>
> 5.      If the claimant cannot perform her past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

See Zirnsak v. Colvin, 777 F.3d 607, 610 (3d Cir. 2014); see also 20 C.F.R.

§§ 404.1520(a)(4), 416.920(a)(4).  Plaintiff bears the burden of proof at steps one through

four, while the burden shifts to the Commissioner at the fifth step to establish that the

claimant is capable of performing other jobs in the local and national economies, in light

of her age, education, work experience, and RFC.  See Poulos v. Comm'r of Soc. Sec.,

474 F.3d 88, 92 (3d Cir. 2007).

The court's role on judicial review is to determine whether the Commissioner's

decision is supported by substantial evidence.  42 U.S.C. § 405(g); Schaudeck v. Comm'r

of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999).  Therefore, the issue in this case is

whether there is substantial evidence to support the Commissioner's conclusion that

Plaintiff is not disabled.  Substantial evidence is "such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion," and must be "more than a mere

scintilla."  Zirnsak, 777 F.2d at 610 (quoting Rutherford v. Barnhart, 399 F.3d 546, 552

(3d Cir. 2005)); see also Biestek v. Berryhill, __ U.S. __, 139 S. Ct. 1148, 1154 (2019)

3

(substantial evidence "means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'") (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  The court has plenary review of legal issues.  Schaudeck, 181 F.3d at 431.

## III.    DISCUSSION

### A.    ALJ's Findings and Plaintiff's Claims

The ALJ found that Plaintiff's dysfunction of the right upper extremity was severe, tr. at 17, but that her obesity, plantar fasciitis, disorders of the cervical and lumber back, depressive disorder, and anxiety disorder were non-severe because "the record does not evidence more than minimal limitations arising out of any of these conditions," and the treatment notes indicate that they were "sporadic or acute in nature" or were "stable and controlled." Id. at 17-18.  Through Plaintiff's date last insured, the ALJ found that she did not have an impairment or combination of impairments that met the Listings, id. at 18, and that she had the RFC to perform light work, except that she could occasionally reach overhead but have no constant repetitive use of the right, dominant hand; and needed the opportunity to alternate positions from sitting or standing every 30 minutes, requiring that Plaintiff be able to perform the job either sitting or standing at her choosing. Id. at 20.  Based on the testimony of a vocational expert ("VE"), the ALJ found that Plaintiff could not perform her past relevant work as a lifeguard and physical/swimming instructor, but could perform the jobs of survey worker, recreation aide, and information clerk. Id. at 27-28.  Therefore, the ALJ found that Plaintiff was not disabled through December 31, 2019, her date last insured. Id. at 29.

4

Plaintiff claims that the ALJ erred in finding that Plaintiff was capable of performing frequent reaching and handling with her right upper extremity, Doc. 6 at 8-11; Doc. 8 at 4-5, and finding her plantar fasciitis, sleep apnea, and obesity non-severe, Doc. 6 at 3-8; Doc. 8 at 1-3.[4]  Plaintiff also argues that the appointment of the Commissioner of Social Security from whom the ALJ and Appeals Council derived their power was in violation of the Separation of Powers clause.  Doc. 6 at 11-14; Doc.8 at 5-9. Defendant responds that the ALJ's decision is supported by substantial evidence, and that the Separation of Powers argument does not entitle her to remand.  Doc. 7 at 3-22.

### B.      Plaintiff's Claimed Limitations and Testimony at the Hearing

Plaintiff was born on September 20, 1969, making her a day shy of her fiftieth birthday on her amended alleged onset date (September 19, 2019), and 50 years of age on her DLI (December 31, 2019).  Tr. at 15, 152.  She has a bachelor's degree and past relevant work as a lifeguard and swim instructor.  Id. at 42, 177.

Plaintiff was injured while working as a lifeguard/swim instructor on June 26, 2014, when a child jumped into the pool and landed on her arm.  Tr. at 42, 358-59.   She has undergone several surgeries that will be reviewed in the discussion of the medical record.  At the administrative hearing, Plaintiff explained that she has limited use of her right arm.  She suffers from pain in the elbow which radiates to her hand and suffers from numbness and nerve pain in her fingers and has limited range of motion ("ROM") of her right wrist.  Id. at 49.  She also has no strength in the arm and explained that she has

---

[4]I have reordered Plaintiff's claims for ease of discussion.

trouble carrying a full coffee mug. Id. She testified that she has no grip strength and can write only a few lines because she cannot hold a pen for any length of time. Id. Plaintiff testified that she also suffers from shin splints and has had two surgeries on the bottom of her feet. Id. at 50. She also suffers from edema in her lower extremities and estimated that she could not even walk around a block without pain. Id. at 51-52.

A VE classified Plaintiff's work as a lifeguard as medium work in the national economy, but "really light" as Plaintiff performed it, and classified her work as a swim instructor position as light. Tr. at 54. The ALJ then posed a series of hypothetical questions, first asking the VE to consider someone of Plaintiff's age, education, and work experience, who could lift and carry 20 pounds occasionally and 10 pounds frequently; sit for 6 hours and stand or walk for 6 hours in a workday; and have no constant repetitive use of the right dominant hand. Id. at 54-55. The VE identified the jobs of recreation aide, usher, and information clerk. Id. at 56.[5] When the ALJ added a limitation that the individual be able to alternate positions from sitting to standing meaning the ability to perform the job either sitting or standing, the VE testified that the usher job would be eliminated, but such a person could perform the job of survey worker in addition to the recreation aide and usher jobs. Id. at 57. When the ALJ added the limitation that the individual could only occasionally reach overhead with no constant repetitive use of the right dominant hand, the VE said that such an individual could perform the jobs

---

[5]The VE testified that the hypothetical person could perform Plaintiff's past work as she had performed it, but Plaintiff then testified that she had lost her certification as a lifeguard/swim instructor and would be physically unable to recertify. Tr. at 55-56.

identified.  Id. at 57-58.  Finally, when asked if an individual were off task more than 20 percent of the day, the VE testified that such an individual could not maintain any employment.  Tr. at 58.

### C.   __Summary of the Medical Record__[6]

As previously mentioned, Plaintiff suffered a wrist injury at work on June 26, 2014.  See tr. at 358.  On October 22, 2014, Blane Sessions, M.D., performed right wrist arthroscopy with triangular fibrocartilage complex ("TFCC") debridement.[7]  Id. at 327-29, 1483-85;[8] see also id. at 801-02.  Dr. Sessions performed a second wrist arthroscopy on May 20, 2015, after which Plaintiff was diagnosed with a "right wrist ulnar extrinsic ligament tear" and "right wrist central TFCC tear."  Id. at 305-07, 359, 1480-83; see also id. at 801-02.

After the surgeries, Plaintiff also began complaining of right elbow and shoulder discomfort and, on March 2, 2015, Dr. Sessions noted that Plaintiff had a right elbow

---

[6]Plaintiff's substantive challenges to the ALJ's decision involves Plaintiff's physical rather than mental health limitations.  Therefore, I will limit my discussion to the evidence relevant to her claims.

[7]The TFCC is "a load-bearing structure between the lunate, triquetrum, and ulnar head.  The function of the TFCC is to act as a stabilizer for the ulnar aspect of the wrist."  See https://www.ncbi.nlm.nih.gov/books/NBK537055/#:~:text=Introduction,acute%20or%20 chronic%20degenerative%20injury. (last visited July 17, 2023).

[8]In a follow up note on October 27, 2014, Dr. Sessions indicated that Plaintiff is "five weeks out from right wrist arthroscopy."  Tr. at 326.  This appears to be a typographical error as the surgical notes are dated October 22, id. at 327, and his examination seems to be of a recent, healing, incision.  Id. at 326.

lateral epicondylitis[9] which was doing well after an injection.  See tr. at 359.  On August

31, 2015, Eric D. Strauss, M.D., found that Plaintiff had reduced range of motion of the

right shoulder and "markedly restricted range of motion" of the right wrist.  Id. at 802.

The following week Dr. Strauss recommended trigger point injections, an MRI of the

right shoulder, and occupational therapy.  Id. at 1163.  The MRI revealed mild

tendinopathy.[10]  Id. at 299.  On January 25, 2016, Plaintiff underwent right cubital tunnel

decompression surgery.[11]  Id. at 286-87, 1134.  On April 7, 2016, Dr. Strauss noted that

Plaintiff had near full range of motion of the right arm.  Id. at 275.  A month later Dr.

Strauss opined that Plaintiff had reached maximum medical improvement and "is capable

of light work consisting of no greater than 20 pounds of lifting or grasping."  Id. at 1594.

---

[9]Epicondylitis is "inflammation of an epicondyle [a condyle is a rounded projection of a bone usually for articulation with another, i.e., joint] of the humerus or the tissues adjoining it, usually from an overuse injury."  Dorland's Illustrated Medical Dictionary, 32nd ed. (2012) ("DIMD"), at 630, 402.

[10]Tendinopathy, also called tendinosis, is any pathologic condition of a tendon. DIMD at 1881.

[11]Cubital tunnel syndrome involves compression of the ulnar nerve.
        The ulnar nerve is one of the three large nerves that crosses
        the elbow . . . .  The ulnar nerve passes across the elbow on
        the medial (inside) side.  . . .  As it crosses the elbow joint, it
        enters a small tunnel referred to as the cubital tunnel.  This
        tunnel is made up of bone on one side and ligament on the
        other.  Because this space is tight, it is a common place where
        the nerve can become compressed.  This compression is often
        referred to as "cubital tunnel syndrome," and it can lead to
        nerve-related problems such as pain, weakness, numbness,
        and even muscle atrophy.
See https://sportsmedicine.mayoclinic.org/condition/ulnar-nerve-cubital-tunnel/ (last visited July 27, 2023).

Plaintiff received no treatment for her arm injuries from May 16, 2016, through May 23, 2018. Id. at 46.

On April 5, 2018, Plaintiff sought treatment for left middle finger joint pain, which Matthew Wilson, M.D., diagnosed as osteoarthritis of the distal interphalangeal joint ("DIP") (the joint closest to the tip) of the left middle finger, and left index finger DIP osteoarthritis status post arthrodesis in 2013.[12] Tr. at 1464.  Plaintiff opted for conservative treatment at that time.  Id.

On May 23, 2018, Plaintiff returned to Dr. Strauss with complaints of worsening symptoms in her right elbow over the prior six months.  Tr. at 1133.  The doctor diagnosed a recurrence of lateral epicondylitis of the right elbow and recommended injections and physical therapy.  Id. at 1135.  On September 4, 2018, Dr. Strauss performed a steroid injection, id. at 1097, 1130, and in November 2018, the doctor performed reconstruction of her right lateral epicondyle.  See id. at 1117, at 1120. During a follow up visit on December 18, 2018, Dr. Strauss noted that Plaintiff's ROM was "excellent."  Id. at 1117.  On January 22, 2019, Dr. Strauss noted Plaintiff complained of tightness in the musculature and performed trigger point injections.  Id. at 1093, 1113.  Two weeks later, the doctor noted that Plaintiff had full ROM and "improved markedly" after the trigger point injections.  Id. at 1088, 1109.  On March 6, 2019, Dr. Strauss discharged Plaintiff with full ROM with permanent restrictions of no heavy lifting or grasping and no constant repetitive hand use.  Id. at 1105.

---

[12]Arthrodesis is the surgical fusion of a joint.  DIMD at 157.

9

Plaintiff returned to Dr. Strauss on July 29, 2019, with complaints of pain and spasm in the right arm.  Tr. at 1101.  The doctor found that Plaintiff "is at maximum medical improvement," and had "no further curative medical treatment to offer."  Id. Plaintiff sought treatment from Dr. Wilson for right elbow pain on October 1, 2019.  Id. at 1461-62.  The doctor noted some tenderness and limited ROM.  Id. at 1461.  Dr. Wilson recommended an MRI and therapy.  Id. at 1462.  An MRI of Plaintiff's right elbow on November 18, 2020, showed mild tendinosis of the common flexor tendon.  Id. at 1636-37.

On November 10, 2020, Stephen Y. Liu, M.D., examined Plaintiff for right elbow pain, wrist discomfort, and stiffness.  Tr. at 1667.  Dr. Liu suspected that Plaintiff's pain derived from "some slight ulnar positive variance/impaction," which he opined might be arthritic or cystic in origin.  Id. at 1669.  A subsequent EMG study was normal and an MRI revealed mild tendinosis.  Id. at 1673.  Dr. Liu planned on performing "a debridement of the right flexor pronator origin [and] an ulnar nerve transposition."  Id. at 1673.[13]  The record does not contain evidence of this surgery having taken place.

With respect to Plaintiff's back, she began treatment with Premier Orthopaedic Sports & Spine Rehabilitation ("Premier") on June 13, 2018, for complaints of low back pain worsening over the last six months, radiating to her lower extremities, and tremors in

---

[13]Ulnar nerve transposition is a surgery to move the ulnar nerve "from its place behind the medial epicondyle to a new place in front of it.  Moving the nerve to the front of the medial epicondyle prevents it from getting caught on the bony ridge and stretching when you bend the elbow."  See https://orthoinfo.aaos.org/en/diseases--conditions/ulnar-nerve-entrapment-at-the-elbow-cubital-tunnel-syndrome/ (last visited July 27, 2023).

her legs with prolonged standing.  Tr. at 1799.  Plaintiff reported a history of lumbar disc herniation.  Id.[14]  Eric Lake, D.O., diagnosed bilateral S1 radiculopathy, requested an MRI of the lumbar spine, and referred Plaintiff for bilateral S1 tranforaminal epidural injections.  Id. at 1799, 1800-01.  A lower spine x-ray showed mild narrowing of the L5-S1 disc space, id. at 1804, and the MRI showed mild face arthropathy but no herniations, stenosis or nerve root impingement.  Id. at 1802-03.  On July 16, 2018, Plaintiff reported thirty-percent overall pain relief from injections performed on June 27, but complained of bilateral lower leg pain radiating to her feet.  Id. at 1796.  Physicians' Assistant ("PA") Andrea Young diagnosed plantar fasciitis,[15] and recommended stretching exercises.  Id.

On July 17, 2020, Plaintiff returned with low back pain radiating to her legs and feet, with an examination revealing decreased ROM of the lumbar spine.  Tr. at 1793.  Adriana S. Prawak, D.O., diagnosed a recurrence of bilateral S1 nerve root irritation, and ordered an updated MRI.  Id.  The MRI showed mild lumbar spondylosis[16] with no change from June 2018.  Id. at 1791.  On July 28, 2020, Plaintiff underwent bilateral S1 epidural injections.  See id. at 1789.  On August 31, 2020, Dr. Prawak noted that Plaintiff had recent right foot surgery (addressed below) and had not been very active.  Id.  The

---

[14]A June 22, 2018 MRI of the lumbar spine revealed no herniations and indicated "resolution of previously noted [2013] tiny central disc herniation at L5-S1."  Tr. at 1803.

[15]Plantar fasciitis is "inflammation of plantar fascia, owing to repetitive stretching or tearing of muscle fibers."  DIMD at 684.

[16]Lumbar spondylosis is "degenerative joint disease affecting the lumbar vertebrae and intervertebral disks, causing pain and stiffness."  DIMD at 1754.

doctor recommended that Plaintiff work on core strengthening on her own followed by physical therapy.  Id.

With respect to her feet, Plaintiff began treatment with Robby Wiemer, DPM, on June 24, 2019, with complaints of painful and swollen heels.  Tr. at 1420.  Dr. Wiemer diagnosed Plaintiff with plantar fascial fibromatosis and synovitis and tenosynovitis of both feet and ankles.[17]  Id. at 1421.  Dr. Wiemer initially treated Plaintiff with a series of injections.  See id. at 1421 (6/24/19), 1424 (7/12/19), 1427 (8/1/19), 1431 (9/6/19).  On October 18, 2019, he performed a left plantar fasciectomy.[18]  Id. at 1433, 1457.  Three days later, Dr. Wiemer described Plaintiff having "mild complaints of pain [and] swelling."  Id. at 1435.[19]  Dr. Wiemer continued treating Plaintiff weekly to bi-weekly through March of 2021, which treatment consisted of injections, debridements, and periodic fasciectomies.  See, e.g., 1445 (11/1/19 - injection), 1447 (11/13/19 -

---

[17]Plantar fibromatosis is a condition characterized by the formation of multiple fibromas, tumors composed of fibrous or fully developed connective tissue, involving the plantar fascia, manifested as single or multiple nodular swellings.  DIMD at 702, 703.  Synovitis is inflammation of a synovium, the connective soft-tissue membrane that lines the inner surface of synovial joint capsules.  Id. at 1856.  Tenosynovitis is inflammation of a tendon sheath.  Id. at 1882.

[18]Fasciectomy is excision of fascia.  DIMD at 684.

[19]The treatment note is internally inconsistent.  In the "Subjective" portion of the note, the doctor indicated that "The patient offers mild complaints of pain, swelling, but no complaints of fever."  Tr. at 1435.  In the next paragraph, also in the "Subjective" portion, the doctor stated, "This patient is seen today with significant swelling in the feet, ankles, and legs."  Id.  In the "Objective" portion of the treatment note, Dr. Wiemer noted that Plaintiff's "legs are very enlarged compared to most people and heavy from fluid retention."  Id. at 1436.  In other treatment records, the doctor noted a "history of lymphatic-type edema and non-pitting edema which is hereditary in nature."  Id. at 1441.

debridement of a non-healing ulcer), 1719 (3/4/20 - injection), 1723 (5/12/20 - incision of foot fascia), 1730 (5/26/20 - post operative examination and injection), 1740 (8/11/20 - incision of foot fascia and injection), 1746-47 (9/1/20 - excision and debridement of non-healing ulcer), 1750 (11/23/20 - injection), 1753 (12/1/20 - injection and right fasciotomy repair of tear), 1760 (12/11/20 - injection), 1765 (12/28/20 – excisional full thickness debridement of necrotic ulcer on right foot due to chronic venous insufficiency, diagnose stress fracture,), 1768 (1/13/21 - bilateral tendinitis,[20] injection of Achilles tendons).

On October 22, 2020, Plaintiff began physical therapy recommended by Dr. Weimer to address with a new onset of shakiness and weakness, poor balance, and altered gait pattern.  Tr. at 1639-40.  On October 26, the physical therapy notes indicate that Plaintiff contacted her doctor about the shakiness "and he thinks that it is due to stopping the gabapentin suddenly" and recommended that she start taking the gabapentin again,"[21] and Plaintiff reported "feeling better than she did" the prior week.  Id. at 1645.  On October 29, 2020, therapist Brian O'Halloran noted that Plaintiff did well with the exercises and her balance seemed to improve.  Id. at 1648.  Plaintiff continued with physical therapy twice a week until November 19, 2020.  See id. at 1649 (11/2/20), 1651 (11/5/20), 1656 (11/9/20), 1658 (11/12/20), 1660 (11/16/20), 1662 (11/19/20).  Plaintiff

---

[20]Tendinitis is inflammation of the tendons and of tendon muscle attachments. DIMD at 1881.  Achilles tendinitis is injury to the Achilles tendon, most often an overuse injury.  Id.

[21]Gabapentin is used to treat partial seizures, nerve pain from shingles and restless leg syndrome.  See https://www.drugs.com/gabapentin.html (last visited Aug. 17, 2023).

was discharged from physical therapy on November 23, 2020, when she reported that her doctor discovered a torn ligament in her foot that required surgery.  Id. at 1664.

On February 9, 2021, Plaintiff returned to Premier with complaints of foot pain. Tr. at 1786.  Jason Miller, DPM, diagnosed Achilles tendinitis of the left leg and bilateral plantar fascial fibromatosis, and ordered x-rays and MRIs.  Id. at 1787-88.  An MRI of the right foot performed on February 28, 2021, revealed "[p]lantar fasciitis with low-grade partial tearing near the origin" with normal Achilles.  Id. at 1709, 1784, 1785.  An MRI of the left foot performed on March 4, 2021 revealed findings consistent with plantar fibromatosis, but no Achilles tendinopathy.  Id. at 1707-08, 1782, 1783.  After reviewing the MRIs, Dr. Miller ruled out Achilles tendinopathy and diagnosed plantar fibromatosis.  Id. at 1781.

With respect to sleep apnea, on October 31, 2018, Plaintiff followed up with pulmonologist James Ortmeyer, M.D., for treatment of previously diagnosed asthma and sleep apnea.  Tr. at 1511-12.[22]  The doctor described her asthma as well controlled on Asmanex[23] and referred Plaintiff to a dentist who specializes in sleep apnea appliances because Plaintiff reported an inability to tolerate a CPAP.  Id. at 1512.  Plaintiff followed up with Dr. Ortmeyer on November 4, 2019, at which time the doctor indicated that "[s]he has been doing well since her last visit" on Asmanex and rarely needs her albuterol

---

[22]On October 9, 2018, Satyen Undavia, M.D., performed surgery to correct a deviated septum.  Tr. at 1553, 1557-58.

[23]Asmanex contains a corticosteroid medicine and is used to prevent asthma attacks.  See https://www.drugs.com/asmanex.html (last visited July 27, 2023).

rescue inhaler.  Id.  at 1499-1500.  The doctor described Plaintiff's asthma as mild and stable on her inhalers.  Id. at 1500.  In addition, the doctor again recommended that Plaintiff see a dentist for a dental appliance to address her sleep apnea.  Id.

On March 11, 2020, at the initial consideration stage, Joanna DeLeo, D.O., found insufficient evidence to assess Plaintiff medically and offered no opinion on Plaintiff's physical RFC.  Tr. at 66.  On reconsideration, Lelwellyn Antone Raymundo, M.D., again found insufficient evidence to offer an RFC assessment.  Id. at 75.  "The available [medical evidence of record] [is] insufficient since it lacks evidence and detailed current exam (gait/station/range of motion, [deep tendon reflexes], strength, sensory etc) to provide an RFC for evaluation of all allegations.  Therefore the case is considered insufficient evidence[.]  There is grip strength but no detailed [musculoskeletal] exam of back as well."  Id.

### D.      Plaintiff's Claims

#### 1.      Limitations with Respect to Right Upper Extremity

Plaintiff argues that the ALJ's RFC determination -- that Plaintiff can perform light work except that she can occasionally reach overhead with no constant repetitive use of the right dominant hand -- overstates Plaintiff's ability to use her right dominant upper extremity and is not supported by substantial evidence.  Doc. 6 at 8.  Defendant responds that the limitations related to Plaintiff's right upper extremity are supported by substantial evidence.  Doc. 7 at 9-12.  Because the ALJ neglected to consider evidence regarding Plaintiff's right wrist and elbow relevant to the period prior to the expiration of her insured status, I will remand the case for further consideration.

15

Prior to Plaintiff's amended onset date (September 19, 2019), she had four surgeries on her right wrist and elbow.  Tr. at 327 (10/22/14 - right wrist arthroscopy with TFCC debridement), 305 (5/20/15 - right wrist arthroscopy with central TFCC debridement and capsulodesis and capsular repair of the ulnar extrinsic ligament), 286-87, 1134 (1/25/16 - right cubital tunnel decompression), 1117, 1120 (11/8/18 – lateral epicondyle reconstruction).  On December 18, 2018, Dr. Strauss, who performed the elbow surgeries in 2016 and 2018, noted that Plaintiff's range of motion was "excellent." Id. at 1117.

On January 22, 2019, Dr. Strauss noted Plaintiff complained of tightness in the musculature and performed trigger point injections.  Tr. at 1093, 1113.  Two weeks later, the doctor noted that Plaintiff had full range of motion and had "improved markedly" after the trigger point injections.  Id. at 1088, 1109.  On March 6, 2019, Dr. Strauss discharged Plaintiff with full range of motion with permanent restrictions of no heavy lifting or grasping and no constant repetitive hand use.  Id. at 1105.

Plaintiff returned on July 29, 2019, with complaints of pain and spasm in the right arm.  Tr. at 1101.  The doctor found that Plaintiff "is at maximum medical improvement" with permanent restrictions in use of her arm, and the doctor had "no further curative medical treatment to offer."  Id.  Dr. Wilson, who saw Plaintiff for arm pain on October 1, 2019, noted tenderness at the lateral epicondyle, pain with resisted wrist extension, and limitations in ROM of the wrist and elbow, and requested an MRI.  Id. at 1461.  An MRI of Plaintiff's right elbow on November 18, 2020 showed mild tendinosis of the common flexor tendon.  Id. at 1636-37.

Thus, six months prior to Plaintiff's (amended) alleged onset date, Dr. Strauss discharged Plaintiff noting she had full range of motion and permanent restrictions of no heavy lifting or grasping and no constant repetitive hand use.  Tr. at 1105.  The ALJ found this opinion "generally persuasive," id. at 25, and accounted for these limitations in the RFC assessment.  See id. at 20 (limiting Plaintiff to light work with occasional reaching overhead and no constant repetitive use of the right dominant hand).  However, although the ALJ referenced Plaintiff's July 29, 2019 complaints of pain and spasm, id. at 23, the ALJ did not mention Dr. Wilson's subsequent examination on October 1, 2019,[24] in which the doctor noted tenderness and limited ROM.  Id. at 1461-62.[25]  Thus, the ALJ based the RFC determination on Dr. Strauss's finding of no limitation in ROM without mentioning Dr. Wilson's later finding of limited ROM.

When there is a conflict in the evidence, the ALJ may choose which evidence to credit and which evidence not to credit, so long as he does not "reject evidence for no reason or for the wrong reason."  Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005); Plummer v. Apfel, 196 F.3d 422, 429 (3d Cir. 1991).  In addition, the Third Circuit requires the ALJ to provide "sufficient development of the record and explanation

---

[24]Dr. Wilson's examination occurred during the period under review, September 19, 2019 (Plaintiff's amended onset date) through December 31, 2019, the day her insured status expired.

[25]In her brief, Plaintiff also relies on the treatment notes of Dr. Liu, who noted a 50% reduction in ROM of the wrist on November 10, 2020 and a then-pending surgery. Doc. 6 at 9 (citing tr. at 1669).  However, Plaintiff's insured status expired on December 31, 2019.

of findings to permit meaningful review." Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004) (citing Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 119-120 (3d Cir. 2000)).

Here, it is unclear whether the ALJ considered Dr. Wilson's examination results and determined the RFC assessment was sufficient to account for the tenderness and limitations in ROM, whether the ALJ rejected Dr. Wilson's examination findings, or just overlooked them. On remand, the ALJ shall explain her consideration of Dr. Wilson's examination results.

Moreover, there is no comprehensive RFC assessment in the record. When the state agency physicians reviewed the record at the initial and reconsideration stages, they both determined that there was insufficient evidence to offer an opinion regarding Plaintiff's physical abilities. Tr. at 66 (initial consideration), 75 (reconsideration). At the reconsideration stage, Dr. Raymundo noted that the "[medical evidence of record] [is]insufficient since it lacks evidence and detailed current exam (gait/station/range of motion, [deep tendon reflexes], strength, sensory etc) to provide an RFC for evaluation of all allegations. Therefore the case is considered insufficient evidence." Id. at 75. The ALJ noted that new evidence was received at the hearing level which provided "a sufficient record to adjudicate [Plaintiff's] application." Id. at 25. It is unclear what additional evidence had been received. On remand, Defendant shall obtain a consultative examination or enlist the services of a Medical Expert to analyze the medical records for the relevant period, if necessary.

2.      Failure to Consider Plantar Fasciitis, Sleep Apnea, and Obesity

Plaintiff complains that the ALJ erred in failing to find her plantar fasciitis, sleep

apnea, and obesity severe, and in failing to consider her sleep apnea a medically

determinable impairment.  Doc. 6 at 3-8; Doc. 8 at 1-3.  Defendant responds that the

ALJ's determination at step two is harmless because she proceeded to the latter steps of

the analysis and considered the limitations caused by all of Plaintiff's impairments --

severe and non-severe -- in determining her RFC.  Doc. 7 at 3-9.

As Defendant notes, an error at the second step of the sequential evaluation is

harmless provided the ALJ determines that one of the claimant's impairments is severe

because the ALJ is required to consider the impact of both severe and non-severe

impairments when assessing a claimant's RFC.  See Salles v. Comm'r of Soc. Sec., 229

F. App'x 140, 144-45 & n.2 (3d Cir. 2007) ("Because the ALJ found in [the claimant's]

favor at Step Two, even if he had erroneously concluded that some of her other

impairments were non-severe, any error was harmless."); see also 20 C.F.R. § 404.1523

("[W]e will consider the combined effect of all of your impairments without regard to

whether any such impairment, if considered separately would be of sufficient severity.").

Here, the ALJ found that Plaintiff suffered from the severe impairment of dysfunction of

the right upper extremity and proceeded to the latter steps of the sequential evaluation.

Thus, the question is whether the ALJ included all of the credibly established limitations

in the RFC assessment and in the hypothetical posed to the VE.  Ramirez v. Barnhart,

372 F.3d 546, 550 (3d Cir. 2004) (citing Chrupcala v Heckler, 829 F.2d 1269, 1276 (3d

Cir. 1987)).

Plaintiff contends that the ALJ's error at step two is not harmless because the ALJ failed to analyze how Plaintiff's plantar fasciitis, sleep apnea, and obesity impacted her ability to engage in the standing/walking necessary to perform light work.  Doc. 6 at 4. Defendant responds that the ALJ's RFC assessment is supported by substantial evidence. Doc. 7 at 4.

### a.    Plantar fasciitis

Plaintiff claims that the ALJ's conclusion that plantar fasciitis was non-severe "is impossible to understand."  Doc. 6 at 5.  Defendant responds that the ALJ properly considered the evidence and adequately accounted for this impairment in limiting Plaintiff to jobs that allowed her to alternate from sitting to standing every thirty minutes at will.  Doc. 7 at 7.

Plaintff was treated for her foot conditions by Dr. Wiemer, and some of his treatment record postdated the expiration of Plaintiff's insured status (December 31, 2019).  Nevertheless, contrary to the ALJ's conclusion, tr. at 18, the treatment notes, even to that point, do evidence more than minimal limitations caused by Plaintiff's plantar fasciitis and edema.  Dr. Wiemer diagnosed Plaintiff with plantar fascial fibromatosis and synovitis and tenosynovitis of both feet and ankles in June of 2019.  Tr. at 1421.  Dr. Wiemer initially treated Plaintiff with a series of injections.  See id. at 1421 (6/24/19), 1424 (7/12/19), 1427 (8/1/19), 1431 (9/6/19).  The doctor noted that "[t]he only thing that gives [Plaintiff] relief is OTC [over-the-counter] pain medication," but noted that "OTC anti-inflammatories are only minimally helping the issue."  Id. at 1429-30.  On October 18, 2019, he performed a left plantar fasciectomy.  Id. at 1433, 1457.  Three days later,

the doctor noted that Plaintiff "offers mild complaints of pain, swelling, but no complaints of fever."  Id. at 1435.  Throughout his treatment of Plaintiff, the doctor noted edema, an antalgic gait, and limited/painful ROM.  See id. at 1430 (9/6/19 - limited ROM left ankle joints), 1435 (10/21/19 - significant swelling in the feet, ankles, and legs), 1439 (10/25/19 - same), 1444 (11/1/19 - edema and antalgic gait), 1449 (1/9/20 - painful ROM, antalgic gait).

Although Defendant contends that the error is harmless because the ALJ accounted for Plaintiff's plantar fasciitis in the RFC assessment by allowing Plaintiff a sit/stand option, Doc. 7 at 7, this is insufficient to address Dr. Wiemer's treatment recommendations.  Throughout his treatment of Plaintiff, Dr. Wiemer recommended that she elevate and ice her ankles and feet.  See tr. at 1431 (9/6/19), 1436 (10/21/19 - elevate and rest), 1439 (10/25/19 - rest, ice compress, and elevate), 1445 (11/1/19 - rest, ice, apply compression and elevate), 1449 (1/9/20 - same).  The ALJ did not account for elevation of Plaintiff's feet in the assessment and did not explain its absence.  Thus, on remand, the ALJ shall reconsider the evidence regarding the limitations imposed by Plaintiff's plantar fasciitis and its treatment and explain the inclusion or exclusion of limitations.

b.    Sleep Apnea

In her decision, the ALJ listed a number of impairments with which Plaintiff was diagnosed during the relevant period.  Tr. at 17-18.  However, the ALJ neglected to mention sleep apnea.  Plaintiff claims this error requires remand.  Doc. 6 at 6-7.

Defendant argues that "[t]here is no evidence supporting Plaintiff's claim that obstructive sleep apnea caused an additional impact on her ability to work." Doc. 7 at 8.

The record contains minimal evidence regarding Plaintiff's sleep apnea. On October 31, 2018, Plaintiff's treating pulmonologist referenced a prior diagnosis of moderate sleep apnea and reported that Plaintiff was "noncompliant with CPAP in the past," and referred Plaintiff to a dentist who specializes in dental appliances related to sleep apnea. Tr. at 1511-12. Again, on November 4, 2019, Dr. Ortmeyer recommended that Plaintiff see a dentist specializing in sleep apnea dental appliances. Id. at 1500.

Despite the dearth of evidence regarding sleep apnea, the ALJ's failure to acknowledge sleep apnea leaves the court to question whether the ALJ considered the impairment or overlooked it. See Jones, 364 F.3d at 505 (requiring sufficient explanation to permit meaningful review). On remand, the ALJ shall specifically address the evidence regarding sleep apnea in the record and explain the inclusion or exclusion of any related limitations.

c.    Obesity

Although the ALJ acknowledged Plaintiff's obesity and noted that she considered the effects of obesity in conjunction with Plaintiff's coexisting impairments, tr. at 18, Plaintiff argues that the ALJ erred in dismissing her obesity as a non-severe impairment without "explicitly considering how - in combination with her other impairments - it impacted Plaintiff's ability to function." Doc. 6 at 7. Defendant responds that the ALJ's statement that she considered obesity at the latter steps of the evaluation is sufficient to establish that she considered the effects of obesity in conjunction with Plaintiff's other

22

impairments in determining her RFC.  Doc. 7 at 7 (citing Samperi v. Berryhill, Civ. No. 18-9382, 2019 WL 1418131, at *8 (D.N.J. Mar. 29, 2019); Marrison ex rel Morrison v. Comm'r of Soc. Sec., 268 F. App'x 186, 189 (3d Cir. 2008)).

Although obesity is not a listed impairment in the governing regulations, the Administration recognizes that "obesity may increase the severity of coexisting or related impairments to the extent that the combination of impairments meets the requirements of a listing."  Social Security Ruling ("SSR") 00-3p, "Titles II and XVI:  Evaluation of Obesity," 65 Fed. Reg. 31039-01, at 31041 (May 15, 2000).[26]  The Third Circuit has held that the ALJ is required to "meaningfully consider the effect of a claimant's obesity, individually and in combination with her impairments, on her workplace function at step three and at every subsequent step."  Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).  In Diaz, the Third Circuit vacated a district court decision affirming the Commissioner's determination that the claimant was not disabled, finding that the claimant's "morbid obesity would seem to have exacerbated her joint dysfunction as a matter of common sense, if not medical diagnosis," id., and the lack of any discussion of the combined effect of the impairments, including obesity, was error.  Id.  "[A]bsent analysis of the cumulative impact of [the claimant's] obesity and other impairments on her functional capabilities, we are at a loss in our reviewing function."  Id.

---

[26]Although SSR 00-3p was superseded by SSR 02-1p, 67 Fed. Reg. 57859-02 (Sept. 12, 2002), SSR 02-1P did not materially amend SSR 00-3p.  See Rutherford, 399 F.3d at 552 n.4.

Having already determined that the case must be remanded, the ALJ should specifically address the limitations imposed by Plaintiff's obesity in conjunction with her other impairments.  See Diaz, 577 F.3d at 503 (noting that obesity may increase the severity of coexisting impairments, specifically with respect to musculoskeletal and respiratory impairments).  I have already determined that the ALJ must reconsider the evidence regarding Plaintiff's right wrist/elbow impairment, plantar fasciitis, and sleep apnea.  In doing so, the ALJ should also be cognizant of the interrelationship of obesity with these impairments and specifically address Plaintiff's obesity in conjunction with these other impairments.

   3. <u>Commissioner's Appointment</u>

Finally, Plaintiff claims that the government deprived her of a valid administrative adjudicatory process based on the Supreme Court's decision in <u>Seila Law LLC v. CFPB</u>, 140 S.Ct. 2183 (2020).  Doc. 6 at 11-14.  Although Defendant agrees that the appointment of the Commissioner at the time of the ALJ's decision violated the separation of powers, Doc. 7 at 13, Defendant contends that this does not entitle Plaintiff to a rehearing of her claim.  <u>Id.</u> at 14-22.  Because I have determined that remand is necessary based on Plaintiff's substantive claims, I need not address this issue.

## IV. <u>CONCLUSION</u>

The ALJ failed to consider evidence regarding the limitations imposed by Plaintiff's right wrist/elbow impairment.  As a result, the ALJ's decision is not supported by substantial evidence.  On remand, the ALJ shall reconsider all of the evidence during the relevant time period regarding Plaintiff's wrist/elbow impairment and the evidence

relating to Plaintiff's sleep apnea, plantar fasciitis, and obesity, discussing the limitations imposed by these impairments in combination.  If the ALJ deems it necessary, she shall order a consultative examination and/or obtain a Medical Expert to consider the records during the relevant time.  An appropriate order follows.